**FILED**
**Oct 04, 2023**
**07:06 AM(CT)**
**TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS**



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT KNOXVILLE

| | | |
|---|---|---|
| **CLAYTON RASH,** | ) | **Docket No. 2022-03-0580** |
| **Employer** | ) | |
| **v.** | ) | |
| **FINE LINE TRANSPORTATION,** | ) | |
| **LLC,** | ) | **State File No. 16843-2022** |
| **Employer,** | ) | |
| **And** | ) | |
| **STARTSTONE NATIONAL** | ) | |
| **INSURANCE COMPANY,** | ) | **Judge Pamela B. Johnson** |
| **Carrier.** | ) | |

_____

### EXPEDITED HEARING ORDER GRANTING BENEFITS

_____

Clayton Rash broke his wrist at work. Fine Line Transportation paid temporary disability benefits and authorized medical treatment, including physical therapy. During physical therapy, Mr. Rash allegedly injured his shoulder. He sought benefits under the direct and natural consequences rule, but Fine Line denied his request. For the reasons below, the Court holds Mr. Rash is likely to prevail at a hearing on the merits and is entitled to medical and temporary disability benefits for his shoulder injury.

### History of the Claim

Mr. Rash worked as a truck driver for Fine Line. On March 7, 2022, Mr. Rash fell and broke his left wrist. He received authorized treatment and underwent surgical repair of the fractured wrist and left carpal tunnel release.[1] After surgery, his treating physician, Dr. Keith Douglas, referred Mr. Rash to physical therapy.

The physical therapist, Eric Harmon, wrote that the treatment plan included, in part, active and passive range of motion exercises, deep friction and scar massage, deep tissue

---

[1] Dr. David Hovis performed the surgeries, until care transferred to Dr. Douglas after Mr. Rash moved to Cookeville, Tennessee.

1

and joint mobilization, taping, and stretching. In late October, Mr. Harmon noted "still guarded with internal rotation posture of the extremity," and he planned to "[continue] to push upper quadrant mobility/strength and forced use."

Two days later, Mr. Rash told Mr. Harmon that he "tried to play catch with the kids; painful trying to close glove." Mr. Harmon "educated [Mr. Rash] that all [activity] at this time will be perceived as painful; however, he is not harming anything and I STRONGLY encourage trying to do more with left arm." (Emphasis in original).

During the November 2 physical therapy session, Mr. Rash felt a pop in his left shoulder, causing immediate pain. The parties disputed when and how the shoulder injury occurred.

Mr. Rash described the incident in his affidavits: "while working my left shoulder and arm in accordance with the instruction of my physical therapist Eric Harmon, I felt a pop in my left shoulder causing me immediate pain." At the hearing, he explained that Mr. Harmon instructed him to lie on the floor and perform "snow angels." When Mr. Rash was unable to move his arms above his head, Mr. Harmon placed his hands on Mr. Rash's left elbow and wrist and pushed his arm above his head. At that point, Mr. Rash reported that he felt a pop and immediate pain, and Mr. Harmon responded that Mr. Rash's muscles were waking. Mr. Rash denied similar pain before the physical therapy incident and said he still has shoulder pain.

Mr. Harmon reviewed his treatment notes and confirmed in his sworn statement that Mr. Rash was instructed to lie down and perform snow angels. He stated, "nowhere in my note did I do any manual therapy." Mr. Harmon denied any recollection of "manipulating [Mr. Rash's] arm or his shoulder." In the physical therapy report for that day, without referencing any shoulder incident, Mr. Harmon noted "[s]uspect increased neurogenic pain from increased stretching and [activity]. Anticipate this to resolve with [continued] use and mobility[.] [E]ducated to [continue] to work on posture and [pectoral] stretches." Follow-up physical therapy sessions in November mentioned left shoulder pain.

At his November 10 appointment, Mr. Rash informed Dr. Douglas that he felt a pop in his shoulder with pain. Dr. Douglas noted, "[h]e was working on shoulder motion with our therapist and then he stopped doing therapy." Dr. Douglas referred Mr. Rash to a shoulder surgeon.

When Fine Line denied his referral to a shoulder surgeon, Mr. Rash filed his first hearing request for expedited hearing, seeking a panel. Before the hearing, Fine Line provided a panel of orthopedic surgeons to treat the left shoulder and authorized treatment with Dr. Kenneth Grinspun.

In January 2023, Dr. Grinspun noted, "[Mr. Rash] was in therapy for the [wrist

fracture] when he was doing some basically snow angel type ROM exercises. He felt a pop in his left shoulder and he's had difficulty raising his arm up since[.]" Dr. Grinspun ordered an MRI, which showed a left rotator cuff tear, and he recommended surgery. Dr. Grinspun answered a causation questionnaire, responding that, after considering all possible causes, the rotator cuff tear primarily resulted from the "snow angel" exercises. On February 13, 2023, Dr. Grinspun assigned work restrictions of no use of left arm until surgery, which Fine line did not accommodate.

Fine Line denied the surgery and obtained an employer's examination with Dr. Sean Kaminsky. After reviewing the medical records, Dr. Kaminsky noted that Mr. Rash reported left wrist, forearm, humerus, and shoulder pain from the work accident.[2] Mr. Rash told Dr. Kaminsky that his shoulder pain started when the physical therapist pushed his arm further while he was doing "snow angels." Mr. Rash felt a pop in his shoulder and pain. He denied any prior history of injury or pain in his left shoulder and continues to have constant, sharp pain.

Dr. Kaminsky reviewed a letter from the physical therapist, who stated, "[Mr. Rash] felt a pop in his shoulder while doing range of motion exercises as well as pain in the joints of the left arm. He was supine on the floor, performing a 'snow angel' range of motion of the shoulder. He was instructed to perform a comfortable range of exercises."[3]

Dr. Kaminsky confirmed the left rotator cuff tear. He noted, "[Mr. Rash] does demonstrate a history . . . consistent with the acute onset of a left shoulder injury, and an acute traumatic rotator cuff tear cannot be ruled out either, either from the initial fall or physical therapy incident." Dr. Kaminsky further wrote, "The cortisone injection may have also resulted in temporary relief of [Mr. Rash's] shoulder pain following an initial rotator cuff injury until the time of the physical therapy encounter." Dr. Kaminsky agreed that surgery was appropriate and medically necessary. However, he added, "It is unusual that a supine active physical therapy exercise event, where the exercise occurs without resistance and neutralizes the force of gravity, would result in a rotator cuff tear."

The parties agreed that both Drs. Douglas and Grinspun were panel-selected physicians. They further agreed that Mr. Rash qualifies for the maximum weekly compensation rate of $1,166.00, and Fine Line paid temporary disability benefits through March 13, 2023.

Mr. Rash requested treatment with Dr. Grinspun for his left shoulder, including the recommended surgery. He also sought temporary disability benefits from March 14, 2023, and ongoing, or twenty-seven weeks, for a total of $31,482.00. He has not worked since his original injury.

---

[2] The parties did not introduce the emergency room records or initial treatment records with Dr. Hovis.
[3] The parties did not offer the letter from Mr. Harmon.

Fine Line disputed that the shoulder injury occurred during physical therapy, because Dr. Kaminsky wrote that "snow angels" are unlikely to cause torn rotator cuff tears, and Mr. Harmon denied manipulating Mr. Rash's left arm.

**Findings of Fact and Conclusions of Law**

Mr. Rash must prove a likelihood of prevailing at a hearing on the merits to receive medical and temporary disability benefits. Tenn. Code Ann. § 50-6-239(d)(1) (2022).

*Medical causation*

Under the Workers' Compensation Law, an "injury" arises primarily out of employment if it is shown to a reasonable degree of medical certainty that the injury contributed more than fifty percent in causing the need for treatment. Tenn. Code Ann. § 50-6-102(12)(C). "Shown to a reasonable degree of medical certainty" means that, in the opinion of the physician, it is more likely than not considering all causes. *Id.* at -102(12)(D).

A later injury, whether in the form of an aggravation of the original injury or a new and distinct injury, is compensable if it is the "direct and natural result" of a compensable injury. *Braden v. Mohawk Indus., Inc.*, 2022 TN Wrk. Comp. App. Bd. LEXIS 11, at *8 (Mar. 1, 2022). Every natural consequence that flows from the work injury arises out of the employment, unless it is the result of an independent intervening cause attributable to the employee's intentional conduct. *Id.* The Appeals Board addressed the parameters of an employee's burden of proof under this rule and concluded:

> [A]n employee seeking to prove that a subsequent injury was a direct and natural consequence of the original compensable injury must come forward with evidence supporting a finding that the subsequent injury "flowed from" or was a "natural consequence" of the original injury. In such circumstances, one way an employer can respond is by showing that the actions of the employee leading to the subsequent injury constituted negligence, recklessness, or intentional conduct that broke the chain of causation.

*Id.* at *13-14.

Here, Mr. Rash credibly testified that he suffered a left shoulder injury during physical therapy. By affidavit, he reported he felt a pop in his shoulder while performing exercises. At the hearing, Mr. Rash explained that when he was unable to move his arms above his head, Mr. Harmon placed his hands on his left elbow and wrist and pushed his arm above his head. Mr. Rash denied similar pain before the physical therapy incident.

Mr. Harmon denied manipulating Mr. Rash's left arm at any time during physical therapy. However, his records note that the treatment plan included, in part, range of motion exercises, massage, joint mobilization, taping, and stretching. In late October, Mr. Harmon planned to "[continue] to push upper quadrant mobility/strength and forced use." Two days later, the date of the alleged incident, Mr. Harmon noted that he "educated [Mr. Rash] that all [activity] at this time will be perceived as painful; however, he is not harming anything and I STRONGLY encourage trying to do more with left arm." (Emphasis in original).

The Court does not find Mr. Harmon's sworn statement, not subject to cross-examination, persuasive. His statements of no manipulation are inconsistent with his treatment plan. His letter advising that he instructed Mr. Harmon to perform the exercises comfortably directly conflicts with his treatment note, where he "educated" Mr. Harmon that all activity will be painful but will not harm anything, and he "strongly" encouraged Mr. Rash to do more.

Moreover, Dr. Grinspun, a panel-selected physician, determined that the left rotator cuff tear primarily occurred because of the physical therapy exercise. He recommended surgical repair. As a panel-selected physician, his causation opinion is rebuttably presumed correct. Tenn. Code Ann. § 50-6-102(12)(E). Likewise, his treatment recommendations as a panel-selected physician are presumed medically necessary. Tenn. Code Ann. § 50-6-204(a)(3)(H).

Dr. Kaminsky noted that a supine active physical therapy exercise event, performed without resistance and neutralizing the force of gravity, would not usually result in a rotator cuff tear. The Court does not find that Dr. Kaminsky's opinion overcomes the presumption the correctness afforded Dr. Grinspun. Even Dr. Kaminsky stated, "[Mr. Rash] does demonstrate a history . . . consistent with the acute onset of a left shoulder injury, and an acute traumatic rotator cuff tear cannot be ruled out either, either from the initial fall or physical therapy incident." Dr. Kaminsky further noted, "The cortisone injection may have also resulted in temporary relief of [Mr. Rash's] shoulder pain following an initial rotator cuff injury until the time of the physical therapy encounter." Dr. Kaminsky also agreed that the recommended surgery was appropriate and medically necessary.

For these reasons, the Court holds Mr. Rash proved he is likely to prevail at trial that his shoulder injury is a direct and natural consequence of his compensable left wrist injury. He is entitled to medical treatment with Dr. Grinspun as the authorized treating physician, including the recommended surgery.

*Temporary disability benefits*

For temporary partial disability benefits, Mr. Rash must show that his treating physician returned him to work with restrictions due to the compensable work injury that

Fine Line did not accommodate. *Heard v. Carrier Corp.*, 2018 TN Wrk. Comp. App. Bd. LEXIS 16, at *5 (Apr. 20, 2018).

Mr. Rash proved that his left shoulder injury is the direct and natural consequence of his compensable wrist injury. His treating physician, Dr. Grinspun, assigned permanent restrictions of no use of his left arm until surgery. Fine Line has not accommodated his restrictions.

The Court holds Mr. Rash proved he is likely to prevail at trial that he is entitled to temporary partial disability benefits from March 14, 2023, and forward.

**IT IS, THEREFORE, ORDERED** as follows:

1. Fine Line shall provide Mr. Rash with medical treatment for his left shoulder under Tennessee Code Annotated section 50-6-204 with Dr. Grinspun.

2. Fine Line shall pay Mr. Rash temporary partial disability benefits from March 14, 2023, and ongoing in the weekly amount of $1,166.00. Twenty-seven weeks, or $31,482.00, have accrued and shall be paid in a lump sum.

3. The parties shall appear for a Status Conference on **December 7, 2023**, at **2:00 p.m. Eastern Time**. The parties must call 855-543-5041 toll-free to participate.

4. Unless interlocutory appeal of this expedited hearing order is filed, compliance with this order must occur by seven business days of entry of this order as required by Tennessee Code Annotated section 50-6-239(d)(3). The insurer or self-insured employer must submit confirmation of compliance by email to wccompliance.program@tn.gov by the compliance deadline. Failure to do so may result in a penalty assessment for non-compliance.

5. For compliance questions, please contact the Workers' Compensation Compliance Program by email at wccompliance.program@tn.gov.

**ENTERED October 4, 2023.**

**JUDGE PAMELA B. JOHNSON**
**Court of Workers' Compensation Claims**

# APPENDIX

Technical Record:
1. Petition for Benefit Determination
2. Employer's Position Statement
3. Dispute Certification Notice, October 31, 2022
4. Hearing Request for Expedited Hearing, December 20, 2022
5. Notice of Filing Panel of Physicians
6. Agreed Order Resolving Expedited Hearing
7. Hearing Request for Expedited Hearing, March 29, 2023
8. Employer's Request for In-Person Hearing
9. Employee's Reply to Request for an In-Person Hearing
10. Order Holding Hearing Request in Abeyance and Referral to Mediation
11. Agreed Order Granting Motion to Continue
12. Dispute Certification Notice, July 20, 2023
13. Order Setting Expedited Hearing
14. Employer's Witness and Exhibit List
15. Employer's Brief

Exhibits:
1. Rule 72 Declaration of Clayton Rash, December 14, 2022
2. Rule 72 Declaration of Clayton Rash, March 27, 2023
3. Sworn Statement of Eric Harmon
4. Return to Work Note of Dr. Kenneth Grinspun
5. Medical Records with Table of Contents:

## CERTIFICATE OF SERVICE

I certify that a copy of the order was sent as shown on October 4, 2023.

| Name | Mail | Email | Service sent to: |
|------|------|-------|------------------|
| Christopher D. Markel, Employee's Attorney | | X | cmarkel@markelfirm.com |
| Allen Callison, Employer's Attorney | | X | allen.callison@mgclaw.com |

**PENNY SHRUM, COURT CLERK**
**WC.CourtClerk@tn.gov**

7



## NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal
Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

### Parties
**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*